UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NEIL TRAINA, et al.,

                        Plaintiffs,

- against-

HSBC MORTGAGE SERVICES, INC.,
individually and d/b/a Household Financial
Corporation and d/b/a Beneficial,

                        Defendant.
-----------------------------------------------------------X

**OPINION AND ORDER**
**13 CV 2336 (SJF)(GRB)**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ DEC 12 2013 ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

On April 17, 2013, fifteen (15) named plaintiffs, and one hundred (100) "John Roe" plaintiffs[1], commenced this action against defendant HSBC Mortgage Services, Inc. ("defendant"), individually and d/b/a Household Financial Corporation and d/b/a Beneficial,[2] pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a).[3] On October 16, 2013,

---

[1] Plaintiffs allege that their counsel "is aware of and has provided services to unnamed ROE Plaintiffs, each of whom sustained actual injury. The unnamed ROES sue under their names fictitiously because they either wish to maintain their privacy or because Plaintiffs' counsel have [sic] not completed the due diligence necessary to properly plead their claims as of the filing of this Complaint. From time to time, upon conducting the due diligence and learning the information sufficient to add remaining ROE Plaintiffs to this action, Plaintiffs shall seek leave of Court to amend this Complaint to name these additional ROE Plaintiffs, or will follow such other process as is proscribed [sic] by the Court." (Amended Complaint ["Amend. Compl."], ¶ 75).

[2] The complaint also named Wells Fargo Bank, N.A. as a defendant, but plaintiffs voluntarily dismissed all claims against that defendant on or about December 5, 2013.

[3] This Court does not have diversity jurisdiction under 28 U.S.C. § 1332(a) because plaintiff Craig Lewis ("Lewis") is a citizen of the same state as defendant, i.e., Illinois. (Amend. Compl., ¶¶ 61, 78). See Lincoln Property Co. v. Roche, 546 U.S. 81, 89, 126 S. Ct. 606, 163 L. Ed. 2d 415 (2005) (holding that diversity jurisdiction "require[s] complete diversity between all plaintiffs and all defendants."); Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000)

1

those same plaintiffs filed an amended complaint against defendant, *inter alia*, adding Yolette Szatkowski ("Szatkowski") as aستعmal named plaintiff and alleging violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*, as well as state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent concealment, fraud, violations of multiple state consumer protection statutes, unjust enrichment and fraudulent inducement.[4] For the reasons set forth below, the claims of all plaintiffs except the first-named plaintiff, Neil Traina ("Traina"), are *sua sponte* severed from this action pursuant to Rule 21 of the Federal Rules of Civil Procedure and dismissed without prejudice to commencing separate actions for each mortgage serviced by defendant.

---

("An individual's citizenship * * * is determined by his domicile. * * * Domicile is the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." (quotations and citations omitted)); In re Balfour MacLaine International Ltd., 85 F.3d 68, 76 (2d Cir. 1996) ("A corporation has dual citizenship for purposes of a federal court's diversity jurisdiction under 28 U.S.C. § 1332; namely, it is a citizen of the state of its incorporation and of the state where it has its principal place of business.") Nonetheless, since two (2) federal claims are present on the face of the amended complaint, this Court has independent subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." See In re Egri v. Town of Haddam, 68 Fed. Appx. 249, 255 (2d Cir. July 1, 2003) (summary order).

[4] On or about December 5, 2013, one of the plaintiffs, Donna Blackledge ("Blackledge"), voluntarily dismissed all of her claims against defendant. Thus, there are fifteen (15) named plaintiffs remaining in this action.

I.   Background

   A.   Factual Background

The amended complaint alleges, *inter alia*, the following:

Defendant received financing from the United States Department of the Treasury ("Treasury Department") in exchange for its participation in the Treasury Department's Home Affordable Modification Program ("HAMP"). (Amended Complaint ["Amend. Compl."], ¶ 1). In addition, as a servicer of Fannie Mae- or Freddie Mac-owned loans and loans backed by the Federal Housing Administration or Veteran's Administration, defendant is "obligated to offer HAMP modifications to [its] respective eligible borrowers, * * *." Id.

Defendant has serviced the respective mortgages of each plaintiff "[f]or a period ranging from months to several years prior to the commencement of this action[.]" (Amend. Compl., ¶ 2).[5] Each plaintiff defaulted on his or her mortgage, id., and requested a loan modification

---

[5] (1) Traina (a) owns premises on Waverly Avenue in Seaford, New York, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about October 2008," (Amend. Compl., ¶ 59); (2) plaintiff Georgette Ramos ("Ramos") (a) owns premises on Lokeleni Street in Naalehu, Hawaii, (b) executed a promissory note to defendant, d/b/a Beneficial Mortgage Company ("Beneficial"), secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about October 2010," (Amend. Compl., ¶ 60); (3) Lewis (a) owned premises on West Lake Shore Drive in Springfield, Illinois until August 2012, when such premises were sold in foreclosure, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about October 2010," (Amend. Compl., ¶ 61); (4) plaintiff Sandra Hart ("Hart") (a) owns premises on Senour Road in Indianapolis, Indiana, (b) executed a promissory note to defendant, d/b/a Beneficial, secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about February 2013, (Amend. Compl., ¶ 62); (5) plaintiff Arthur Lee ("Lee") (a) owns premises on Oregon Avenue in Louisville, Kentucky, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about November 2012, (Amend. Compl., ¶ 63); (6) plaintiff Raymon Bembenek ("Bembenek")

3

through defendant. (Amend. Compl., ¶ 3). According to plaintiffs, defendant only allows loan relief or a loan modification upon a default. (Amend. Compl., ¶ 3).

Defendant ignored some of the plaintiffs' requests for loan relief or loan modification, but provided some of the plaintiffs with a modification application package requiring them, *inter*

---

(a) owns premises on Ellen Street in Webster, Massachusetts, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about June 2010, (Amend. Compl., ¶ 64); (7) plaintiff Stephanie Sizemore ("Sizemore") (a) owns premises on C Street in Chesapeake, Maryland, (b) executed a promissory note to defendant, d/b/a Beneficial, secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about February 2013, (Amend. Compl., ¶ 65); (8) plaintiff Lucas Marsh ("Marsh") (a) owns premises on Goldsboro Road in Sudlersville, Maryland, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about November 2012, (Amend. Compl., ¶ 67); (9) plaintiff Stephen Ungeheuer ("Ungeheuer") (a) owns premises on Van Dorn Street in Keyport, New Jersey, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about March 2013, (Amend. Compl., ¶ 68); (10) plaintiff Nicole Gomez ("Gomez") (a) owns premises on Rosedale Avenue in Ewing, New Jersey, (b) executed a promissory note to defendant, d/b/a Beneficial, secured by a mortgage against those premises and (c) applied for loan modification from defendant on or about June 2009, (Amend. Compl., ¶ 69); (11) plaintiff Curtis Singleton ("Singleton") (a) owns premises on Rosewood Drive in Bordentown, New Jersey, (b) executed a promissory note to defendant, d/b/a Household Financial Corporation ("HFC"), secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about February 2013," (Amend. Compl., ¶ 70); (12) plaintiff Richard Michaels ("Michaels") (a) owns premises on Tim Street in Stroudsburg, Pennsylvania, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about April 2012," (Amend. Compl., ¶ 71); (13) plaintiff Eric Snook ("Snook") (a) owns premises on Wesley Lane in Coatesville, Pennsylvania, (b) executed a promissory note to defendant secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about October 2010," (Amend. Compl., ¶ 72); (14) plaintiff Jose Aguirre ("Aguirre") (a) owns premises on Chickamauga Court in Chesterfield, Virginia, (b) executed a promissory note to SouthStar Funding, LLC secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about February 2013," (Amend. Compl., ¶ 73); and (15) Szatkowski (a) owns premises on Independence Court in Bensalem, Pennsylvania, (b) executed a promissory note to defendant, d/b/a HFC, secured by a mortgage against those premises and (c) applied for loan modification from defendant "multiple times, including on or about February 2008," (Amend. Compl., ¶ 74).

*alia*, "to provide documentation necessary to process the modifications as a condition for the modification agreement." (Amend. Compl., ¶ 4). According to plaintiffs, defendant "represented to [each plaintiff provided a modification application package] that, following the submission and review of a completed modification package, [he or she] would be given terms to make payments as part of a trial modification." (Amend. Compl., ¶ 5). Plaintiffs allege that if they "made the necessary monthly payments under the terms of the trial modification, a permanent modification would be perfected." (Amend. Compl., ¶ 5).

According to plaintiffs, each of them accepted defendant's respective loan modification offer to him or her "and worked to meet the terms required of [him or her], expecting Defendant[] to be bound to perform [its] obligation of granting permanent modifications." (Amend. Compl., ¶ 6). Each plaintiff "either provided all of the requested documentation in support of [his or her] loan modification application to Defendant, and otherwise met all the conditions precedent pursuant to a trial modification offer, or attempted to do so in good faith, but faced substantial interference from Defendant[]." (Amend. Compl., ¶ 8).

Some plaintiffs did not meet all of defendant's conditions precedent because defendant purportedly "put in place procedural safeguards to make the modification process as onerous and complicated as possible, shepherding [those] Plaintiffs into foreclosure, even going so far as providing conflicting information to [them] regarding which information was received or still needed." (Amend. Compl., ¶ 9). Plaintiffs allege that defendant's "policies were to intentionally delay the application and documentation process so that documents had to be resubmitted and deadlines passed." Id. As an example, plaintiffs allege that upon applying for a loan

modification from defendant, Aguirre "was informed that he would have to pay several thousands of Dollars before Defendant would discuss modification with him, and would not stop the foreclosure sale of Defendant's house even if he did." Id.

Some plaintiffs provided all of the required information and documentation to defendant, but defendant "still sent missing documentation requests, which often included documents previously sent by [those] Plaintiffs." (Amend. Compl., ¶ 10). Those plaintiffs again provided the requested documents to defendant, sometimes multiple times. Id. Plaintiffs allege that defendant's "missing document requests constituted a policy to interfere with and overly burden [their] compliance with modification terms, and were a result of deficient protocols within [its] loan modification operations." (Amend. Compl., ¶ 11).

Some plaintiffs "were denied trial modifications on baseless claims that their financial status precluded them from being considered for a modification." (Amend. Compl., ¶ 12). "In cases where trial modification was not given, Defendant[] either gave no explanation for the denial, or alleged that [those] Plaintiffs did not provide the necessary documentation for processing or review." (Amend. Compl., ¶ 13). Plaintiffs allege that defendant's "belief that conditions precedent were not satisfied was based on [its] own conflicting reports and inconsistent status updates, and the failure of [its] loss mitigation representatives to adequately conduct document intake." Id.

Some plaintiffs were "given terms to make modification payments on a trial basis," (Amend. Compl., ¶ 14), and "made the required payments under the terms of the offered trial modification." Id. Those plaintiffs "often ultimately learned, sometimes only after inquiring,

that a permanent modification was not provided." (Amend. Compl., ¶ 15). As an example, plaintiffs allege that Traina applied for a modification of his high interest rate loan from defendant on or about October 2008 and was given a six (6)-month trial plan "offering deferral of interest, but otherwise no change to interest rate or principal." Id. After complying with the terms of that trial modification for the six (6)-month period, Traina was offered the same temporary terms for another six (6) months instead of being given a permanent modification, which he accepted and fulfilled. Id. According to plaintiffs, after the year period, defendant demanded that Traina pay thirty-six thousand dollars ($36,000.00) in arrears, "after which he could resume his original payments * * *." Id. "Traina repeatedly attempted to obtain modification from [defendant] in the following years, and was again offered the same six-month plan in late 2011[,]" not a "permanent solution." Id. As another example, Bembenek "completed a six-month trial modification with [defendant] in 2010 that merely lowered his monthly payments by $75 [seventy-five dollars], only to learn from Defendant that it had no intention of offering a permanent modification." Id. According to plaintiffs, "[t]his process was repeated in 2011 with a slightly better payment[,] [but] * * * Bembenek never got a permanent modification * * *." Id. Snook was also given a trial modification by defendant, "but after six month [sic] of payments was not given a permanent modification, and [defendant] never communicated any explanation." Id. According to plaintiffs, defendant "had no intention to grant a permanent modification, since it was not in [its] financial interest to do so * * * [and] continued to collect trial payments, stripping as much remaining equity from Plaintiffs as possible, knowing that Plaintiffs were pre-destined for a permanent modification rejection."

(Amend. Compl., ¶ 16).

Finally, some plaintiffs were granted permanent modifications, but defendant purportedly "included such disadvantageous terms that ultimately rendered [those] Plaintiffs' performance impossible * * *." (Amend. Compl., ¶ 17). Those "disadvantageous terms" include "fail[ing] to lower the monthly payment, add[ing] a decade to the term of the loan, or creat[ing] unmanageable balloon payments at the end of the term of the loan." Id. As an example, in the summer of 2009, following a six (6)-month trial modification in which her monthly mortgage payments were approximately one thousand five hundred dollars ($1,500.00), defendant provided Gomez with a five (5)-year modification that increased her loan principal and monthly payments to two thousand thirty dollars ($2,030.00), "instead of lowering them." Id.

Plaintiffs allege that modification of loans is not in defendant's "pecuniary interest" because "[u]nder [its] [Credit Default Swaps ("CDS")/Collateralized Debt Obligations ("CDO")] scheme, [it] only receive[s] full reimbursements for [its] losses if the mortgaged property is sold through foreclosure sale or short sale, but not if the loan is modified * * *." (Amend. Compl., ¶ 19). According to plaintiffs, defendant's "CDS/CDO holdings create a financial offset beyond the amount that could reasonably be obtained through sale in foreclosure[,]" (Amend. Compl., ¶ 23), enabling it to "compare the modified [Net Present Value calculation ('NPV') required under HAMP] with an amount higher than would be realized through [foreclosure] sale alone." Id.

Plaintiffs allege that defendant: (1) has "instituted companywide policies ensuring an absence of standards for determining who will be granted HAMP loan modifications by [it] * * *," (Amend. Compl., ¶ 25); (2) "drive[s] [its] inventory of loans into default and eventual

8

foreclosure, allowing [it] to obtain payment on the undisclosed insurance taken out against the interests of the Plaintiffs and other homeowners/mortgagors," (Amend. Compl., ¶ 26); (3) "evaded requirements * * * to deal with [them] fairly and in good faith toward reasonable loan modification agreements of financially troubled loans," (Amend. Compl., ¶ 27); (4) "ha[s] had, and continue[s] to have, a fraudulent loan modification program, purporting to offer the possibility of a loan modification agreement to the Plaintiffs and other homeowners, while driving them into default to enable [it] to pursue foreclosure against those same homeowners," (Amend. Compl., ¶ 28); and (5) "falsely led the Plaintiffs and others similarly situated to believe that there was hope for loan modification and no threat of foreclosure, deterring them through misrepresentation for an extended period from seeking alternative refinancing or selling their property at the highest price," (Amend. Compl., ¶ 32). Plaintiffs allege that they "have the capacity to make monthly payments based on their notes, if those were restructured with a principal amount in line with the present value of the properties and at a lower interest rate, in line with current market rates * * * [and] should have an option to do so * * *." (Amend. Compl., ¶ 22).

Plaintiffs further allege that defendant engaged in "deceptive and predatory lending practices * * * during the origination of [their respective] loans * * * [by] offering loans with terms that would never have been accepted by [them] based on their financial means, had it not been for [defendant's] misrepresentation of material terms." (Amend. Compl., ¶ 33). According to plaintiffs, as "further induce[ment]" for them to accept defendant's loans, defendant "assured [each of them] that housing prices would continue to rise and made other general

9

misrepresentations as to the stability of the housing market." (Amend. Compl., ¶ 34). In addition, plaintiffs allege that defendant: (1) "insufficiently relied upon" "their actual financial documents," (Amend. Compl., ¶ 35); (2) "consistently preyed upon [them] by providing loans unsuitable to [their respective] incomes at the time, or in the foreseeable future," id.; (3) "intentionally ignored established safeguards put in place to ensure that the loans were appropriate for the respective borrowers," id.; (4) "often did not require [them] * * * to provide sufficient documentation * * * to document and prove their income * * * [and] [i]nstead * * * encouraged and accepted the bear-bones [sic] loan applications without conducting the proper due diligence required to determine whether [they] were qualified to receive each of their individual loans," (Amend. Compl., ¶ 37); (5) "offered loans at higher rates, and/or with higher origination fees, for borrowers who could not show income sufficient to qualify for the loans," (Amend. Compl., ¶ 38); (6) "either negligently or willfully approved Plaintiffs for loans, when it should have been apparent to [its] underwriters that default was a likely outcome," (Amend. Compl., ¶ 39); and (7) "abused [its] superior bargaining position" by "offer[ing] and recommend[ing] certain loans to [them], while simultaneously assuring that [they] could easily sell or refinance their homes at any time for more favorable terms, if they ever did find themselves in a position where the loan became too difficult to maintain * * *, while simultaneously planning for the opposite to occur," (Amend. Compl., ¶ 40), and knowing "that the housing market was due for a severe downturn," (Amend. Compl., ¶ 41). As an example, plaintiffs allege that on or about June 2006, defendant sold Bembenek "an adjustable rate refinance loan with a high interest rate margin, although [it] was fully aware that * * * Bembenek

relied on Social Security and VA benefits for his income." (Amend. Compl., ¶ 39).

In addition, plaintiffs allege that defendant: (1) failed to disclose to them (a) "the varying nature of the [several types] of [its] offered loans, [and] the individual implications of each type of loan * * *, especially their long-term ramifications, including default and foreclosure[,]" (Amend. Compl., ¶ 43), and (b) "payment information like escrow amounts, or variable payment terms," (Amend. Compl., ¶ 52); (2) "marginalized the fact that the negative amortization feature [of its adjustable rate pay option loans] could make the loan difficult to refinance, * * * or that home values were likely to decline, or that there were significant prepayment penalties[,]" (Amend. Compl., ¶ 45); (3) "stressed adjustable rate loan's low payments in the early years * * * and downplayed the inevitable payment shock that would be felt by the borrower when the payments increased[,] * * * although [defendant] had no reason to believe that Plaintiffs' income would increase in a similar fashion[,]" (Amend. Compl., ¶ 47); (4) "steered [them] into loans not suitable for their individual financial situations[,]" (Amend. Compl., ¶ 50); and (5) "clearly instituted companywide policies designed to maneuver [them] into [certain] loans regardless of whether they ultimately qualified for them, with the goal of obtaining greater profits through adjustable rates, negative amortizations, or higher rates than could be afforded * * *[,]" (Amend. Compl., ¶ 53). According to plaintiffs, some of them, including Bembenek, were "subject to" defendant's "intentionally inadequate[] disclos[ure]," (Amend. Compl., ¶ 49), of the implications of an adjustable rate loan. (Amend. Compl., ¶ 47).

Plaintiffs allege that "[u]pon learning of various predatory practices and potentially illegal abuses, [they each] submitted [a] Qualified Written Request[] ("QWR") under [RESPA], 12

USC [sic] § 2605(e) * * *[,]" (Amend. Compl., ¶ 54), to defendant, "formally disput[ing] the validity of [their respective] current debts with [defendant] and request[ing] all available information pertaining to [their respective] loans * * *."[6] (Amend. Compl., ¶ 55). According to plaintiffs, defendant has "failed to sufficiently comply with the QWRs in a meaningful way, or to attempt in any way to resolve the issues about which [they] complained * * * and ha[s] not provided an adequate reason for [its] refusal to do so." (Amend. Compl., ¶ 56).

B.  Procedural History

On April 17, 2013, fifteen (15) named plaintiffs and one hundred (100) "John Roe" plaintiffs commenced this action against defendant. On October 16, 2013, sixteen (16) named plaintiffs and one hundred (100) "John Roe" plaintiffs filed an amended complaint against defendant asserting the following claims for relief: (1) breach of contract (Count I), (Amend. Compl., ¶¶ 80-94); (2) breach of the implied covenant of good faith and fair dealing (Count II), (Amend. Compl., ¶¶ 95-99); (3) promissory estoppel (Count III), (Amend. Compl., ¶¶ 100-106); (4) fraudulent concealment (Count IV), (Amend. Compl., ¶¶ 107-120); (5) fraud for demanding and collecting monthly note payments under false pretenses (Count V), (Amend. Compl., ¶¶ 121-

---

[6] (1) Traina and Ramos each submitted a QWR to defendant on or about April 2013, (Amend. Compl., ¶¶ 59-60); (2) Lewis submitted a QWR to defendant on or about February 2013, (Amend. Compl., ¶ 61); (3) Hart and Szatkowski each submitted a QWR to defendant on or about August 2012, (Amend. Compl., ¶¶ 62, 74); (4) Lee and Singleton each submitted a QWR to defendant on or about September 2012, (Amend. Compl., ¶¶ 63, 70); (5) Bembenek, Gomez, Michaels, Snook and Aguirre each submitted a QWR to defendant on or about January 2013, (Amend. Compl., ¶¶ 64, 69, 71, 72, 73); (6) Sizemore submitted a QWR to defendant on or about July 2012, (Amend. Compl., ¶ 65); (7) Marsh submitted a QWR to defendant on or about October 2012, (Amend. Compl., ¶ 67); and (8) Ungeheuer submitted a QWR to defendant on or about January 2012, (Amend. Compl., ¶ 68).

139); (6) violations of multiple state consumer protection statutes (Count VI), (Amend. Compl., ¶¶ 140-160); (7) violations of the TILA (Count VII), (Amend. Compl., ¶¶ 161-172); (8) unjust enrichment (Count VIII), (Amend. Compl., ¶¶ 173-182); (9) fraud in the inducement (Count IX), (Amend. Compl., ¶¶ 183-190); and (10) violations of RESPA (Count X), (Amend. Compl., ¶¶ 191-198). Plaintiffs seek, *inter alia*: (1) specific performance of defendant's purported contractual obligations to each of them; (2) judgment declaring that defendant is required by the doctrine of promissory estoppel to honor the terms of each plaintiff's respective loan modification agreement "or rules of equity," (Amend. Compl., at p. 42, ¶ C); (3) an injunction permanently enjoining defendant from collecting on his or her respective promissory note; and (4) to recover (a) his or her actual damages "for injuries suffered by [him or her], equity removed for foreclosed properties, and payments not entitled to be received by Defendant[]," (Amend. Compl., at p. 42, ¶ E), (b) damages "for mental anguish and emotional distress suffered by [him or her] as a result of [defendant's] fraudulent modification practice * * *," (Amend. Compl., at p. 43, ¶ F), (c) actual and statutory damages "pursuant to the various state consumer protection statutes," (Amend. Compl., at p. 43, ¶ G), (d) actual damages resulting from defendant's TILA violations; (e) actual and treble damages resulting from defendant's RESPA violations "and additional damages as the Court may allow in an amount not to exceed $2,000.00 [two thousand dollars] per Plaintiff, for violations of 12 USC [sic] § 2605(e)," (Amend. Compl., at p. 43, ¶ I); and (f) attorney's fees, costs and statutory pre-judgment interest. On or about December 5, 2013, all plaintiffs voluntarily dismissed their claims against a second named defendant, Wells Fargo Bank, N.A., and one (1) of the sixteen (16) named plaintiffs, Blackledge, voluntarily dismissed

all of her claims against defendant.

II. Discussion

    A. Permissive Joinder of Plaintiffs

Rule 20(a)(1) of the Federal Rules of Civil Procedure permits the joinder of multiple plaintiffs in an action if:

> "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action."

In determining whether claims relate to, or arise out of, the same "transaction" or "occurrence" under Rule 20(a), "courts are to look to the logical relationship between the claims and determine 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" Kalie v. Bank of America Corp., — F.R.D.—, 2013 WL 4044951, at * 3 (S.D.N.Y. Aug. 9, 2013) (quoting United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1979)); see also Abraham v. American Home Mortgage Servicing, Inc., — F. Supp. 2d —, 2013 WL 2285205, at * 3 (E.D.N.Y. May 23, 2013) (Rule (20)(a)(1)); Peterson v. Regina, 935 F. Supp. 2d 628, 638 (S.D.N.Y. 2013) (Rule 20(a)(2)); Deskovic v. City of Peekskill, 673 F. Supp. 2d 154, 166 (S.D.N.Y. 2009) (Rule 20(a)(2)); Barnhart v. Town of Parma, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (Rule 20(a)(1)). Plaintiffs bear the burden of demonstrating that joinder is proper under Rule 20(a). Kalie, —F.R.D.—, 2013 WL 4044951, at *5; Deskovic, 673 F. Supp. 2d at 159.

Plaintiffs' claims in this case are not properly joined pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure. Indeed, judicial economy and fairness dictate that each

plaintiff's respective claims be tried separately. This case involves fifteen (15) distinct loans secured by separate properties scattered across ten (10) different states, i.e., one (1) in New York, one (1) in Hawaii, one (1) in Illinois, one (1) in Indiana, one (1) in Kentucky, one (1) in Massachusetts, two (2) in Maryland, three (3) in New Jersey, three (3) in Pennsylvania and one (1) in Virginia, (Amend. Compl., ¶¶ 59-74), thus requiring: (a) the application of ten (10) different state laws to plaintiffs' claim alleging violations of state consumer protection laws and (b) convoluted choice-of-law analyses with respect to plaintiffs' seven (7) other pendent state law claims, with the potential of ten (10) different state laws being applied to those state law claims as well. Moreover, one (1) of those properties was sold in foreclosure, but the other fourteen (14) were not. Other factual disparities include: (1) that each plaintiff (a) separately applied for a distinct type of mortgage loan at different times in different places, (b) submitted different documents and information in support of his or her application to defendant, (c) qualified for his or her loan based upon his or her distinct characteristics, e.g., income, property value, loan amount, etc., (d) received different types of mortgage-backed loans, i.e., some plaintiffs received loans with higher interest rates while others received loans with higher origination fees, some plaintiffs received fixed rate loans while others received adjustable rate loans or adjustable rate pay option loans containing a negative amortization feature, etc., (e) separately applied for loan modifications from defendant at different times over a five (5)-year period, i.e., from February 2008 to February 2013, and different places, with some of the plaintiffs applying for only one (1) loan modification and others applying for multiple loan modifications, and (f) separately submitted a distinct QWR to defendant at different times over a fifteen (15) month period, i.e., between January 2012 and April 2013; (2) defendant allegedly ignored the applications of some of the plaintiffs, but provided other plaintiffs with "a modification application package * * * detailing the terms of [its] offer," (Amend.

15

Compl., ¶ 4); (3) some of the plaintiffs met all of the conditions precedent to receive a trial loan modification offer, but others did not; (4) some of the plaintiffs were nonetheless denied trial modifications "on baseless claims," (Amend. Compl., ¶ 12), while others were given no explanation for the denial of their respective applications; (5) some of the plaintiffs received trial modification offers from defendant, but the terms of those offers differed from plaintiff to plaintiff; and (6) some of the plaintiffs even received permanent loan modifications from defendant. Thus, the discrete loan transactions upon which plaintiffs claim a right to relief do not relate to, or arise out of, the "same transaction, occurrence, or series of transaction or occurrences" for purposes of Rule 20(a)(1). See, e.g. Visendi v. Bank of America, N.A., 733 F.3d 863, 870 (9th Cir. 2013) (holding that the claims of one hundred thirty-seven (137) plaintiffs against financial institutions alleging, *inter alia*, deceptive mortgage lending practices were not properly joined because the plaintiffs' interactions with the defendant were not uniform and the "[f]actual disparities * * * [were] too great," i.e., the case involved over one hundred (100) distinct loan transactions, the loans were secured by separate properties scattered across the country and some of the properties, but not all, were sold in foreclosure); Adams v. US Bank, NA, No. 12 CV 4640, 2013 WL 5437060, at * 4 (E.D.N.Y. Sept. 27, 2013) (finding that the plaintiffs, who claimed that various banking and lending institutions, savings corporations and mortgage service providers fraudulently induced them into entering into loans and mortgages and illegally foreclosed on their real property, were improperly joined because their claims involved, *inter alia*, "different facts, different properties located in different states, * * * and different analyses of underlying state law"); Kalie, — F.R.D.—, 2013 WL 4044951, at * 4 (holding that the claims of fifty-two (52) homeowners from sixteen (16) different states against banks and loan servicers alleging, *inter alia*, violations of TILA, RESPA and lending-practices misconduct were not properly joined together); Abraham,

16

2013 WL 2285205, at * 4 ("[C]laims by plaintiffs who engaged in separate loan transactions by the same lender cannot be joined in a single action." (emphasis omitted)). Accordingly, plaintiffs are not properly joined in this action pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure.

B. Misjoinder

Rule 21 of the Federal Rules of Civil Procedure provides, in relevant part, that "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." Thus, "[i]f a court concludes that [parties] have been improperly joined under Rule 20, it has broad discretion under Rule 21 to sever [those] parties * * * from the action." Kalie, — F.R.D.—, 2013 WL 4044951, at * 3 (quoting Deskovic, 673 F.Supp.2d at 159-60); see also Adams, 2013 WL 5437060, at * 4.

In determining whether to sever parties improperly joined under Rule 20(a), courts generally consider, in addition to the factors set forth in Rule 20(a), "whether settlement of the claims or judicial economy would be facilitated; [] whether prejudice would be avoided if severance were granted; and [] whether different witnesses and documentary proof are required for the separate claims." Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp., 288 F.R.D. 331, 333 (S.D.N.Y. 2013) (quoting Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd., 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011)). "A court should consider whether severance will 'serve the ends of justice and further the prompt and efficient disposition of litigation.'" Crown Cork, 288 F.R.D. at 332 (quoting T.S.I. 27, Inc. v. Berman Enters., Inc., 115 F.R.D. 252, 254 (S.D.N.Y. 1987)); see also In re Ski Train Fire in Kaprun, Austria, on November 11, 2004, 224 F.R.D. 543, 546 (S.D.N.Y. 2004).

Joinder of plaintiffs' claims does not serve the interest of judicial economy. See, e.g. Kalie,

17

2013 WL 4044951, at * 6 ("Inasmuch as each plaintiff's claims appear to arise out of a mortgage-related transaction that is distinct from the transactions on which the other plaintiffs' claims are based, and as each plaintiff's claims implicate distinct loans, locations, dates and personnel, there is no meaningful economy of scale gained by trying the[] cases together.") There will be little, if any, overlapping discovery and each plaintiff's claims will require distinct witnesses and documentary proof. "The interest in economy is affirmatively disserved by forcing these many parties to attend a common trial at which these separate, unrelated claims * * * would be resolved." Id. Furthermore, settlement of the claims is likely to be facilitated if the claims relating to discrete loan transactions are litigated separately. See Adams, 2013 WL 5437060, at * 4 ("[S]ettlement of the claims and judicial economy are likely to be facilitated if the claims [that plaintiffs were fraudulently induced into entering into loans and mortgages and their properties illegally foreclosed upon] are litigated separately in the appropriate state or federal district court.") In addition, "[a] joint trial could lead to confusion of the jury and thereby prejudice [the] defendant[]." Kalie, — F.R.D.—, 2013 WL 4044951, at * 6 (quotations and citation omitted). Accordingly, all claims by plaintiffs other than Traina are *sua sponte* severed pursuant to Rule 21 of the Federal Rules of Civil Procedure and dismissed without prejudice to commencing separate actions for each distinct mortgage serviced by defendant. The statute of limitations for any claim asserted herein is deemed tolled during the pendency of this action and for a period of thirty (30) days from the date of this Order.

III. Conclusion

For the reasons stated herein, all claims by plaintiffs other than Traina are *sua sponte*

18

severed pursuant to Rule 21 of the Federal Rules of Civil Procedure and dismissed without prejudice to commencing separate actions for each distinct mortgage serviced by defendant. The statute of limitations for any claim asserted herein is deemed tolled during the pendency of this action and for a period of thirty (30) days from the date of this Order.


SO ORDERED.

s/ Sandra J. Feuerstein
SANDRA J. FEUERSTEIN
United States District Judge

Dated: December 12, 2013
      Central Islip, N.Y.